# CHARLES TOWN.

DANIEL *v.* SIMMS *et al.*

Decided September 7, 1901.

1. BALLOT—*Voter—Tickets to be Defaced.*

   A ballot, prepared and perfected under the provisions of section 34 of chapter 3 of the Code, is one of the columns on the ballot sheet, described in said section, so changed as to suit the wishes of the voter, and is a list in one of such columns of the names of all the persons for whom the voter desires to vote, with the designation of the office he desires each of them to fill, and every other column on the ballot sheet must be defaced in the manner prescribed in said section. (p. 557).

2. VOTER MUST ONLY USE ONE COLUMN.

   The provisions of said section, requiring the names of all persons for whom the voter desires to vote to be placed in one of such columns, and all other columns on the sheet to be defaced, are mandatory; and, if the voter, in the preparation of his ballot, violates said provisions, his vote cannot be counted, although his intention to vote for certain candidates may be clearly expressed upon the ballot sheet. (p. 558).

3. COURTS—*Ballots—Intention of Voter.*

   The courts are strongly inclined to hold up the legality of ballots, not entirely conforming to the requirements of law, if the intention of the voter can be ascertained, but statutes prescribing the form of ballots and kind of paper on which they are to be printed, and prohibiting marks, figures or devices thereon, by which one can be distinguished from another, are designed to preserve the secrecy of the ballot and to prevent fraud, intimidation or bribery, and they are generally held to be mandatory, and are always so held when such statutes provide that a

ballot varying from such requirements shall not be counted. (p. 559).

4. Right of Citizen—*Regulation of*.

Such regulations of the constitutional right of the citizen to vote are reasonable and do not abridge or unduly impede the exercise of such right, although by disregarding them the voter disfranchises himself, provided such regulations are plain and may be easily observed. (p. 559).

5. Construction of Statute—*Circumstances*.

Where the language of a statute is in any manner ambiguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy. (p. 560).

6. Construction of Statutes—*When Overruled*.

The construction, given to a statute by those charged with the duty of executing it, ought not to be overruled without cogent reasons. (p. 561).

7. Words—*Their Meaning—How Interpreted*.

The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions. (p. 563).

8. Statutes—*How Construed*.

All former statutes on the same subject, whether repealed or unrepealed, may be considered in construing provisions that remain in force, and a repealed section which defines a term' does not change the meaning of the term when found elsewhere in the original connection, and the section repealed may be referred to, to determine the meaning of such terms. (p. 569).

9. Words—*Judicial Construction—Presumption*.

When words in a statute, have acquired, through judicial interpretation, a well understood legislative meaning, it is to be presumed they were used in that sense in a subsequent statute on the same subject, unless the contrary appears. (p. 572).

10. Board of Canvassers—*Mandamus*.

If a board of canvassers adjourn, without having legally performed its duties under section 68 of chapter 3 of the Code, such board may be reconvened by writ of *mandamus* under section 89 of said chapter and compelled thereby to correct any errors it may have committed in attempting to perform such duties. (p. 574).

Error to Circuit Court, Fayette County.

Application by N. Daniel for a writ of *mandamus* to M. J. Simms and others. Writ granted, and defendants bring error.

*Affirmed.*

ST. CLAIR, WALKER & SUMMERFIELD and McWHORTER & LOWENSTEIN, for plaintiffs in error.

MOLLOHAN, McCLINTIC & MATHEWS and PAYNE & HAMILTON, for defendant in error.

POFFENBARGER, JUDGE:

At the election, held in Fayette County, November 6, 1900, N. Daniel was the candidate on the Republican ticket for the office of sheriff and P. M. Snyder the candidate on the Democratic ticket for the same office. The face of the returns, as laid before the board of canvassers, showed that Daniel had received four thousand one hundred and sixteen votes and Snyder four thousand three hundred and ninety-six. Daniel demanded, a recount. Such recount was had, and, as the result thereof, it was found that Daniel had received four thousand one hundred and thirty-seven votes and Snyder four thousand four hundred and fifty. During the recount, Daniel objected to the counting for Snyder of more than four hundred votes, and his objections being overruled and the vote counted for Snyder, he objected, at the conclusion of the recount, to the granting of a certificate of election to Snyder, and his objection was overruled, the result declared and said certificate granted. Then, upon the petition of Daniel, the judge of the circuit court of said county issued an alternative writ of *mandamus,* commanding the board of canvassers to reconvene and recount the ballots and reject the ballots, to the counting of which for Snyder, Daniel had objected, and then to declare the result according to the facts. On the 27th day of December, 1900, two of the members of the board of canvassers and Snyder appeared and moved to quash the alternative writ. The petitioner then amended the petition, with leave of the court, by making Snyder a party thereto. This was objected to by the defendants, but their objection was overruled and they then renewed their motion to quash the writ. On the 31st day of December, 1900, the cause came on for hearing, the motion to quash was overruled, the ballots in question, having been brought into court, were examined, and the court, being of opinion that they should not have been counted for Snyder, but should have been rejected and not counted at all, awarded a peremptory writ of *mandamus,* commanding the board of examiners to reconvene as such and recount the original ballots and absolutely reject and

not count certain ballots as to the office of sheriff. There were
four hundred and ninety-nine of these ballots, and the defen-
dants have brought the case here on a writ of error.

It is conceded in the argument that enough of these ballots to
change the result, shown on the face of the returns, are in the
same condition as were those rejected, under the mandate of this
Court, in the case of *Morris* v. *Board of Canvassers,* 48 W. Va.
251, (38 S. E. 500). The ballot sheet contained five ballots,
columns or tickets. The first or left-hand column was the Dem-
ocratic ballot. Next to it was the Prohibition Party ballot.
Next to this was the People's Party ballot. After that was the
Social Democratic Party ballot. The last or right-hand column
was the Republican ballot. In each of these columns appeared,
first, the names of candidates for presidential electors; second,
condidates for State offices; third, candidates for representatives
in congress; fourth, candidates for State senator; fifth, candi-
dates for county offices, under the designation of "County
Ticket;" sixth, candidates for district offices. The rejected bal-
lots were marked in the following manner: All the columns,
except the Republican and Democratic, were completely defaced
by lines drawn clear down through them from the top to the
bottom. A line was drawn through the Democratic ballot from
the top down to the words "County Ticket," the balance of it re-
maining undefaced. Then a line was drawn from the words
"County Ticket" on the Republican ballot down to the bottom,
leaving the National, State, Congressional and Senatorial tickets
undefaced.

Although it was clearly the intention of the persons deposit-
ing these ballot sheets to vote the Republican National, State,
Congressional and Senatorial tickets and the Democratic county
and district tickets, the votes so intended for Snyder were prop-
erly ordered by the circuit court to be rejected, for the reason
that that intention is not expressed in the manner prescribed by
law. The reasons assigned in the opinion in *Morris* v. *Board
of Canvassers,* prepared by JUDGE BRANNON, are sufficient, con-
clusive and based upon the undoubted weight of authority. But
in view of the thorough argument of this case, and of the criti-
cism and argument found in JUDGE DENT's dissenting opinion
in that case, further discussion of the principles involved is
deemed appropriate.

The solution of the question requires the construction of sections 34 and 66 of chapter 3 of the Code, which are as follows: Section 34: "All ballots prepared under the provisions of this chapter shall be printed on white paper of uniform size, of the same quality, and sufficiently thick that the printing cannot be distinguished from the back; and shall contain the name and residence of every candidate whose nomination for any office has been certified or filed according to the provisions of this chapter, and no others. The names of all candidates nominated by each political party, respectively, shall be printed upon the ballots in columns, one column for each political party, each column containing the names of candidates nominated by the same political party, and no others; and if any candidate be nominated by a convention or primary election for any office, the name of any other candidate nominated in any other way provided for in this chapter, for the same office, shall not be printed on the ballots in the same column with the name of said candidate nominated by said convention or primary election; and the candidates shall be arranged in groups, under the designation of the offices for which they are respectively nominated. At the head of each column of political party nominations shall be printed in clear, bold type, the name of the political party (or principle) which the candidates represent, as contained in the certificates of nomination; and sub-headings may be placed over each group to indicate the political division for which the respective groups are to be elected. Immediately after the name of each candidate there shall be left a blank space between that and the next name or whatever is printed thereon at least one-half inch. A voter desiring to erase the name of any candidate from the ballot he intends to vote, or to vote for any other candidate or person in his stead, may strike out the name so printed on said ballot, and write in the blank space next following the name of the candidate or person for whom he so desires to vote. But if he fails to strike from said ballot the name printed thereon, the name written in said blank shall alone be counted as to said office. The several ballots to be voted at any election shall be printed side by side on the same sheet of paper, the Democratic ballots on one side thereof and the Republican ballots on the other, and the other ballots, if any, between them, with one black line between each of them, and all candidates or persons voted for by any voter, shall be those whose names are

printed or written as aforesaid thereon; and every other ballot on the same sheet shall be defaced by drawing one or more lines with pen and ink or indelible pencil from the top to the bottom thereof, or across the heading thereof, or in any other way indicating that the same has not been voted by the voter. But if more than one of said ballots have nothing on them to indicate which of them was not so voted, then neither of them shall be counted."

Section 66; "If two or more ballots be found folded or rolled together and the names thereon be the same, one of them only shall be counted; but if the names thereon be different, in any particular, neither of them shall be counted except as hereinbefore provided; and, in either case, the commissioners of election shall, in writing in ink, place a common number on said ballots and state thereon that they were folded or rolled to-. gether when voted. If any ballot be found to contain more than the proper number of names for any office such ballot shall not be counted as to such office. In any election for senator, if a person be voted for on any ballot who is not a resident of the proper county, as required by the fourth section of the sixth article of the Constitution, such ballot shall not be counted for said office. Any ballot which is not endorsed with the names of the poll clerks, as provided in this chapter, shall be void and shall not be counted; and any ballot, or part of a ballot, from which it is impossible to determine the elector's choice of candidates, shall not be counted as to the candidate or candidates affected thereby. On completing the count, and recording the same on tally sheets, the commissioners of election shall immediately make a memorandum of the total vote cast for each candidate, deliver a copy thereof to each member of such board, and post a copy thereof on the front door of the polling room, and transmit a copy thereof to the clerk of the county court, who shall post the same in his office for public inspection."

That part of section 34, which is here involved, is directed to the voter mainly, and prescribes the manner of preparing his ballot or ticket. Section 66 is directed to the precinct election officers and tells them how they shall proceed in ascertaining the result of the election at the precinct. The meaning of the word "ballot" as used in each of these sections is of vital importance. As found in some parts of section 34, it undoubtedly means the whole sheet of paper on which all the columns are

printed, but the important question is, what does it mean in that part of the section which reads: "The several ballots to be voted at any election shall be printed side by side on the same sheet of paper. The Democratic ballots on one side thereof, the Republican ballots on the other, and the other ballots, if any, between them, with one black line between each of them, and all candidates or persons voted for by any voter, shall be those whose names are printed or written as aforesaid thereon; and every other ballot on the same sheet shall be defaced by drawing one or more lines with pen and ink or indelible pencil from the top to the bottom thereof, or across the heading thereof, or in any other way indicating that the same has not been voted by the voter. But if more than one of said ballots have nothing on them to indicate which of them was not so voted, then neither of them shall be counted."

Now, it is contended, presumably for two reasons, that the word "ballot" here means the separate offices and candidates to be voted for, and not either the sheet or the column. The first reason is, that the word is plural, in some places, and the second, that a ballot has been defined as "A piece of paper, or suitable material with the name written or printed upon it, of the person to be voted for." Cush. Leg. Assemb., s. 103; Cooley's Cons. Lim., 760. Why the word is here made plural does not appear and no satisfactory reason can be assigned for it. That it does not mean the separate offices and candidates to be voted for, a large number of imaginary ballots all in one column under the designation of "Republican Ticket" or "Democratic ticket," is clear from the language of the section as well as from the context.

This statute contemplates and means that the voter shall cast one ballot. The first thing the voter shall do, after obtaining the ballot sheet from the clerk, is to select "the *ballot* he intends to vote," *not the ballots* he intends to vote; for it says, "A voter desiring to erase the name of any candidate from the *ballot* he intends to vote." That the word "ballot" here means the whole column is apparent from this language. If it only meant that part of the column sufficient to contain the name of one candidate, the statute, instead of saying "erase the name of *any* candidate from the ballot" would say erase the name of *the* candidate from the ballot. If the word ballot in this section means

only the name of one candidate, then one man is all the voter could vote for, for he is directed to prepare one ballot, and the statute says, "every other ballot on the same sheet shall be defaced." It further says, "If more than one of the said ballots shall have nothing on them to indicate which of them was not so voted, then neither of them shall be counted," showing conclusively here again that the voter is only permitted to deposit one ballot. The language of the statute indicating how a *ballot* not voted, is to be defaced, shows that ballot, as there used, means a column. It may be done by drawing one or more lines "from the top to the bottom thereof." Is it reasonable to suppose this direction relates to a portion of the sheet, the vertical dimension of which is little more than one-half inch, while the horizontal dimension is all of two inches? It may be defaced by crossing out the heading of it. There is no heading to the imaginary separate portions of the column containing many of the names. The section speaks of headings and sub-headings. The heading can be nothing but "the name of the political party (or principle)," printed in clear, bold type "at the head of each column." "Every other ballot * * * * shall be defaced by drawing one or more lines * * * * across the heading thereof." Nothing on the sheet but the column has a heading. It is a physical impossibility to deface any thing on the sheet in that way but the column. Therefore, nothing can be meant by the use of the word "ballot," in this connection, but the column. The voter being required to deface every column on the sheet but one, all that is left for him to use is the remaining column and that must be his ballot.

To reach the conclusion that the word ballot used in this direction to the voter means a single name on a ballot sheet, and the words "Democratic ballots" and "Republican ballots" mean the several names appearing respectively, in the Democratic and Republican columns on the sheet, not only requires an analysis of the language too intricate and refined to have been intended, by the legislature, to be unraveled by the ordinary citizen, but is found also to be illogical and contradictory of the terms of the statute itself. Ballot means what the legislature, the people, and the courts of this State understood it to mean, at the time of the passage of the act, and had understood it to mean, for more than twenty-eight years prior thereto—a single

piece of white paper containing the names of all the persons for whom the voter wishes to vote and the designation of the office he desires each of them to fill, without any other name on it or any mark, save those sanctioned by the act itself, namely, the names of the poll clerks on the back of it and the defaced columns on the face of it.

Section 34 is not ambiguous, but, if it were, the application of the familiar rules of interpretation and construction brings us irresistibly to the same conclusion. Under the law as found in the Code of 1860, the mode of voting in the state of Virginia, of which this State was then a part, was *viva voce;* although it was provided that "In an election for electors for President and Vice-President of the United States, the officer shall receive from each voter a paper or ticket containing the names of as many persons for electors as the state may be entitled to for the time being. The name of the voter shall be written on the back of the paper, and he shall also declare *viva voce* for whom he votes as electors, either by repeating the name of each person voted for, or by any other distinct designation of them collectively; provided, that if he be dumb, he may vote by ballot." In 1863, under the old constitution, the legislature, in section 18 of chapter 3 of the acts, provided that "Every person offering to vote at an election shall present to one of the inspectors a single ballot, written or printed upon white paper, which shall be folded or rolled so that its contents cannot be seen, and if there be any mark, color, or device visible on the same, intended to distinguish it from other ballots voted at the election, it shall not be received. The ballot shall contain the names of the persons for whom he wishes to vote, and designate the office he desires each of them to fill." From that time until the passage of the act of 1891, this portion of the law, prescribing the mode of voting and defining a ballot, underwent some slight changes but remained substantially the same. Under the new constitution, that portion of the act which required the ballot to be folded or rolled so that its contents could not be seen, could not be retained and was stricken out, for the reason that the present constitution guarantees to the citizen the right to vote an open ballot. Immediately before the passage of the act of 1891, providing for the present system of voting, section 13 of chapter 3 of the Code provided that "Every person offering to vote at an election

shall present to one of the commissioners a single ballot, written or printed upon white paper, and if there be any mark, color, or device visible on the same, intended to distinguish it from other ballots voted at the election, it shall not be received. The ballot shall contain the names of the persons for whom he wishes to vote and designate the office he desires each of them to fill." Acts 1882, section 13, chapter 155.

The present Constitution of this State was adopted in 1872, nearly twenty years prior to the passage of the act of 1891, and section 2 of article IV of that instrument reads: "In all elections by the people, the mode of voting shall be by ballot; but the voter shall be left free to vote either an open, sealed or secret ballot as he may elect." What did the people, in adopting this Constitution, understand the word "ballot" to mean? Having used as a ballot, in all their elections for ten years, at least, a piece of white paper containing all the names of all the persons and propositions for whom and which they had voted in any one election, can it be possible that they understood it to mean only one name on that paper? It is within the power of the legislature, of course, to change the form and definition of the ballot, and this is only referred to in connection with what precedes it, to show what ballot was understood to mean. The people of this State, for at least twenty-eight years, having used and recognized in all their eletcions, a piece of white paper, containing all the names of all the persons for whom any person intended to vote in any election, as the ballot and the legislature, and the courts having so recognized and understood it; can it be possible that the legislature in section 34 of the act of 1891, giving to the voter directions for the preparation of his ballot, contemplated or intended a sort of thing that the most vivid imagination would never detect or discover, except in the exigency of some particular case, and with the aid of learned and astute counsel?

Under this old system of voting, which was not peculiar to this State but obtained practically throughout all the states, the door was wide open to fraud, and every election precinct was a scene of confusion and uproar. The ballots were not furnished by the officials but by individuals, generally by the executive committees of the contending political parties. Anybody could have printed and distributed among the people such ballots or

tickets, as they were termed, as he desired. Democratic tickets might be printed and distributed around the polling places with the name of one Republican candidate cunningly and fraudulently inserted in a place where the name of a regularly nominated Democratic candidate ought to be, or the name of some Democrat who was not a candidate might be inserted there. A voter coming upon the ground and desiring to vote the Democratic ticket, might have one of these fraudulent tickets placed in his hands, and, without examining it closely, deposit it, and thus be defrauded out of his vote as to that particular office in which he felt most deeply interested. The Republican, and all other tickets, might have been dealt with in the same way. Tickets could be prepared by persons who, by reason of employment, credit or other cause, had control over voters, and these persons so under control could be supplied with tickets which they did not desire to vote and rushed, under compulsion and intimidation, to the polls and made to express, not their own sentiments and will, but the wishes of some other person. The purpose of the act of 1891 was to reform our entire election system and break up, and render impossible, as far as could be done, this confusion and fraudulent conduct about the polling places.

To show that the legislature recognized, in this act, that the voting in this State, as elsewhere, was directed and controlled by political organization, and that each political party nominated and presented to the people its "Ticket," and desired the names of all of its candidates, its entire ticket upon its own ballot, and that the legislature so provided, it is only necessary to examine the act generally. Section 18 defines a convention and says it "is an organized assembly of voters or delegates of any political party" for the purpose of nominating candidates. Section 19 defines a primary election and says it "is an election held by voters who are members of any political party" for the purpose of nominating candidates. Section 21 provides for certifying the names of candidates nominated by a convention, by the presiding officer and secretary of the convention. Section 22 provides for certifying nominations made by primary elections. Section 23 prescribes the form of the certificate, and contains a blank for the name of the political party. Section 24 provides for the nomination of candidates otherwise than by conventions

and primary elections. Section 26 provides for the appoint-
ment of State, congressional, judicial, senatorial, district and
county executive committees of political parties. There are
other portions of the act which recognize and relate to political
organizations. Each of the two leading parties must be repre-
sented on the board of ballot commissioners, in the commis-
sioners of election at the precincts and in the clerks of the elec-
tion. Section 34 recognizes, by name, the existence of two polit-
ical parties in the State. All of this shows that it was not the
purpose of the legislature to break up or interfere with the ex-
istence, or the general practices, of the political parties then in
existence, or thereafter to come into existence in this State; but
to regulate and legally sanction them. No reference to such
organizations is found in any preceding legislation.

The practice under the election system then in existence was
for the vast majority of the voters of the State to identify them-
selves with the two political organizations named in the statute.
They then went to the polls and each selected, on the grounds on
the outside of the election room or in the election room, or had
selected before he reached the voting place, a ticket or ballot, ob-
taining it from whomsoever he might be able to get it. This
ballot ordinarily contained the names of the candidates of the
political party to which he belonged. Until he made changes in
it, it contained no other names. It contained exactly what the
legislature, in the act of 1891, requires to be put in the column
at the head of which stands the name of the political organiza-
tion to which the voter belongs. When the voter now looks
upon that column he sees exactly what would be the old ballot,
which he had been accustomed to vote, in that portion of the
paper on which it is printed, if it were cut off from the balance
of the sheet. The legislature has provided that all the ballots,
to be used in an election now, shall be printed on one piece of
paper side by side, that they cannot be handled by any person
outside of the election room on election day, that they shall be
printed and prepared by officers appointed for that purpose who
shall keep them in their custody and control until required for
the use of the voter at the very moment he proposes to vote, that
the voter, upon obtaining one of these sheets shall first select,
from all of those on the sheet instead of from the hand of a
neighbor, the ballot he intends to vote and then permits him to
make such changes in it as he desires to make, in substantially

the same manner in which formerly he changed his old ballot, and that, after having made such changes in it as he desires to make, he shall then deface every other ballot on the sheet. Having done this, he has before him just what he handed to the commissioner under the former law—a list, in one column, of the names of all the persons for whom he desires to vote, with the designation of the office he desires each of them to fill, written or printed upon white paper. That was the ballot then. It is the ballot now.

How are statutes to be construed? How is the meaning of words in a statute to be ascertained? How far is it permissible to inquire into the conditions existing at the time of the passage of the act? From what sources, and by what rules is the legislative intent to be ascertained? Are the matters of history and legislation, above detailed, entitled to any weight or consideration in the solution of this question? The answers come from the highest court in the land.

"Where the language of a statute is in any manner ambiguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy." *Smith* v. *Townsend,* 148 U. S. 490; 23 Am. and Eng. Ency. Law 336. Our statute requires the board of ballot commissioners to distribute to the election precinct cards of instruction and sample ballots. These are to be posted up around the polling places and in the boothes, the sample ballots marked according to the instructions, printed on the cards. It is a well known fact, which is not denied, that these sample ballots in the election of 1900, and all former elections, held under the present law, were marked by the election officers at the precincts so as to show that the names of all candidates for whom the voter desired to vote should be in one column. That such were the instructions and the mode of voting in Fayette county is apparent from the fact that of the more than eight thousand ballots there used less than five hundred were prepared in a different way. Moreover, such were the instructions and sample ballots, sent out to the public by the executive committees of the leading political organizations. The election officers, therefore, so construed the statute as to require all the names to be in one column, and thus construed the word ballot to mean the column. "The construction, given to a statute by those charged with the duty of executing

it, ought not to be overruled without cogent reasons." *U. S.* v.
*Moore,* 95 U. S. 760; *Brown* v. *U. S.,* 113 U. S. 568; 23 Am.
Eng. Ency. Law 339. As has been shown, the people of the State
understood an election ballot to be a list of all the names of all
the candidates for whom the voter intended to vote. "The popu-
lar or received import of words furnishes the general rule for
the interpretation of public laws as well as of private and social
transactions." *Maillard* v. *Lawrence,* 16 How. (U. S.) 251; 23
Am. Eng. Ency. Law 326. In the opinion of the court in this
case, delivered by Mr. Justice Gray, it is said: "If language
which is familiar to all classes and grades and occupations—
language, the meaning of which is impressed upon all by the
daily habits and necessities of all—may be wrested from its
established and popular import in reference to the common con-
cerns of life, there can be little stability or safety in the regula-
tions of society." Prior to the enactment of the present election
law, the legislature of the State had defined an election ballot to
be a piece of white paper, containing the names of the persons
—not one name but all the names—for whom the voter wished
to vote, with the designation of the office he desired each of them
to fill. "In cases of doubt or uncertainty, acts *in pari materia*
may be referred to in order to discern the intent of the legisla-
ture in the use of particular terms." *Vane* v. *Newcomb and
Smith, receivers, etc.,* 132 U. S. 220; 23 Am. Eng. Ency. Law
315. In *Viterbo* v. *Friedlander,* 120 U. S. 707, the following
is found in the opinion: "But it is a familiar canon of inter-
pretation that all former statutes on the same subject, whether
repealed or unrepealed, may be considered in construing pro-
visions that remain in force." In *United States* v. *Le Bris,* 121
U. S. 278, it is held that "A repealed section which defines a
term does not change the meaning of the term when found else-
where in the original connection; and the section repealed may
be referred to, to determine the meaning." *Forqueran* v. *Don-
nally,* 7 W. Va. 114. Whenever the courts of this State have
used the word ballot, under the legislation prior in date to the
act of 1891, they must have used it as defined in that legislation.
They could not have used it in any other sense. "When words
in a statute, limiting the power of this court in the review of
cases, have acquired, through judicial interpretation, a well un-
derstood legislative meaning, it is to be presumed they were
used in that sense in a subsequent statute on the same subject,

unless the contrary appears." *Abbottsford* v. *Johnson,* 96 U. S. 440; *Minor* v. *Mechanic's Bank of Alexandria,* 1 Pet. (U. S.) 46. These are rules of interpretation and construction, universally recognized and followed. They are directly applicable to this question and conclusively settle it.

It was not contended in the argument of this case, nor seriously in the *Morris-Wertz Case* that section 34 means anything else than a direction to the voter to place the names of all persons for whom he desires to vote in one column. It was, and is, insisted, by those who claim that the ballots in question here are legal, that the provisions of section 34 are directory and not mandatory; and, therefore, that the preparation of the ballot in a manner different from that directed by the law does not invalidate the vote of the person depositing the ballot so prepared. On the other hand, counsel for Daniel insist that these provisions are mandatory and that any departure from them invalidates the votes. This question is so thoroughly discussed in the opinion in the *Morris-Wertz Case* that it is deemed unnecessary to devote much time to it here. If the word ballot means a column, as is here held, the rules by which to determine whether the provisions of the statute are mandatory or directory show that in this instance they are mandatory and must be observed. Lord Mansfield's rule is that the question depends upon whether that which was directed to be done was or was not of the essence of the thing required. *Rex* v. *Locksdale,* 1 Burr. 447. The supreme court of New York, in *People* v. *Cook,* 14 Barb. 290, has held that "Statutes directing the mode of proceeding by public officers are directory, and are not regarded as essential to the validity of the proceedings themselves, unless it be so declared in the statute." Judge Cooley says "This rule strikes us as very general, and is likely to include within its scope in many cases, things which are of the very essence of the proceeding." Cooley's Cons. Lim. 89. In *People* v. *Schermerhorn,* 19 Barb. 540, the same court holds "Statutory requisitions are deemed directory only when they relate to some immaterial matter, where a compliance is a matter of convenience rather than of substance." After considering this and other cases Judge Cooley lays down this rule: "Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly and prompt conduct of the business, and by a failure to obey which the rights of those inter-

ested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute." Cooley's Cons. Lim. 93, citing numerous decisions, which he says might easily be laregly increased. Now look at the qualification he puts upon this rule: "*But this rule presupposes that no negative words are employed* in the statute which expressly or by necessary implication forbid the doing of the act at any other time or in any other manner than as directed." Cooley's Cons. Lim. 93. Then immediately follows this caution: "Even as thus laid down and restricted, the doctrine is one to be applied with great circumspection; for it is not to be denied that the courts have sometimes, in their anxiety to sustain the proceedings of careless and incompetent officers, gone very far in substituting a judicial view of what was essential for that declared by the legislature."

In the construction of this statute, the qualification of the general rule must be applied, for there are words in the statute which "by necessary implication forbid the doing of the act in any other manner than as directed." After directing the voter how to prepare his ballot, the statute provides that "every other ballot on the same sheet shall be defaced by drawing one or more lines with pen and ink or indelible pencil from the top to the bottom thereof, or across the heading thereof, or in any other way indicating that the same has not been voted by the voter." The statute also contains an express prohibition of the preparation of the ballot in any manner other than that directed, as well as denounces a fatal consequence of disobedience, in the clause: "But if more than one of said ballots have nothing on them to indicate which of them was not so voted then neither of them shall be counted." Thus, by the highest test known to the courts and the law writers, the provisions of the statute in question are shown to be mandatory. It is not always necessary that a negative clause be used, to make it mandatory. Judge Cooley says, "There are cases where, whether a statute was to be regarded as merely directory or not, was made to depend upon the employing or failing to employ negative words, plainly importing that the act should be done in a particular manner or time, and not otherwise. The use of such words is often conclusive of an intent to impose a limitation; but their absence is

by no means equally conclusive that the statute was not designed to be mandatory." Cooley's Cons. Lim. 89. This work is quoted thus extensively, partly for the reason that it is so often referred to and so extensively relied upon in the argument by counsel for plaintiffs in error. While it is true that the courts struggle to uphold the legality of ballots, where they do not conform to the requirements of the law, if the intention of the voter can be ascertained, yet it must be admitted that statutes prescribing the form of ballots, kind of paper, and prohibiting marks, figures or devices by which one can be distinguished from another are generally held to be mandatory." "These statutes, being designed to preserve the secrecy of the ballot and to prevent fraud, intimidation, and bribery will generally be considered mandatory, and this will be so *in all cases where the statute provides that a ballot varying from the requirements of the law shall not be counted; but if this provision is lacking,* while it is the duty of the election officers to refuse to receive the ballots, it deviations from the law are manifest; if they have been received they should not be rejected, if the variations are but trifling." 6 Am. & Eng. Ency. Law 349. This is a general proposition of law and is supported by numerous cases cited. The statute here considered is one which "proivdes that a ballot varying from the requirements of the law," in the particular in question, "shall not be counted." Hence, by this rule and classification, it is mandatory.

The legislature having so expressed its will, it is unnecessary to inquire why it compels the voter to put the names of all persons for whom he desires to vote on one ticket or ballot. It may be to preserve the secrecy of the ballot and to prevent fraud, intimidation or bribery, by requiring all ballots to be in the same form. That the legislature designed and intended that the ballots shall not be so distinguishable from one another as to make it possible for any voter to disclose, by the form of his ballot, or by any mark or device on it, how he voted, is perfectly clear. Section 79 of the statute makes it a felony, punishable by imprisonment in the penitentiary for not less than one or more than two years, for any voter to place any mark upon his ballot, or to suffer or permit any other person to do so, by which it may be afterwards identified as the ballot voted by him. It has been seen that under the former legislation of this State, no ballot was

permitted to be received, which had any mark, color or device visible on the same intended to distinguish it from the other ballots voted at the election. The liberal rule of construction whereby it is sought to give effect to the intention of the voter obtains in Illinois. *Parker* v. *Orr,* 156 Ill. 609; 30 L. R. A. 227, cited by counsel for plaintiff in error, holds "A requirement that the ballot be marked by a cross in the appropriate margin or place opposite the name * * * * as directory, and not mandatory, and under it the voter's intention should be given effect, if it can be gathered from his ballot *without laying down a rule which may lead to the destruction of its secrecy.*" The court held, nevertheless, that where a voter, instead of making the cross, had written the word "Democratic" at the head of the Democratic ticket, his ballot could not be counted. It further held that a ballot marked by a single mark through the circle or square, or marked with a circle or irregular character within the circle or square or marked with crosses entirely outside of the squares, must be rejected as disregarding the plain directions of the law, and as furnishing the means whereby the secrecy of the ballot could be destroyed. It was also held that where the mark on the ballot bore no resemblance to a cross nor any attempt to make a cross it could not be counted. The reasoning of that court, applied to the contention of counsel for the plaintiff in error here, utterly demolishes it, although it holds the statute to be directory. The political complexion of that court is unknown to us, but as there has been some accusations of partisanship against some of the courts, in respect to the rules of construction applied here, it is noted that, in *Parker* v. *Orr,* the Democratic candidate had been declared elected by one vote, and the Supreme Court which finally decided the case did not reverse the lower court. If such irregularities as are mentioned in that case are subversive of the secrecy of the ballot, certainly a voter, by preparing his ballot in a form, different from that prescribed by the law, might much more clearly identify it by its form, and thereby commit a much graver offence against the principle of secrecy in elections. If this were permitted, voters might be organized at the various precincts with the understanding that, for good or evil purposes, they would thus identify their ballots. The law does not permit it for any reason or for any purpose.. It is absolutely inhibited and made penal in this State. In the brief of counsel for plain-

tiff in error, there is set forth the written opinion of an able and prominent lawyer of this State, on the subject of marking the ballot, in which it is attempted to be shown that ballots, marked as are those in question here, are legal ballots and must be counted, and, in the brief, it is said this opinion was printed and seven thousand copies of it distributed throughout Fayette County immediately before the election. There is no reason for doubting that this was done for pure and patriotic motives. At the same time, it must be remembered that, upon some other occasion, in some other place and by persons other than those concerned in the management of the campaign for county officers in Fayette County, the same method or plan might be pursued as a part of a scheme of corruption and debauchery or intimidation, such as the legislature may have intended to prevent by the provision here construed.

The opinion, so distributed, was founded, in part at least, upon the decision of this Court in the case of *Dunlevy* v. *County Court,* 47 W. Va. 513, (33 S. E. 956). Point 1 of the syllabus of that case is quoted at length in it. It was requested, in the argument, that the record, briefs and opinion in the *Dunlevy Case,* be carefully considered in the decision of this case. An examination of them fails to disclose that the question presented here and in the *Morris-Werlz Case* was raised there. Not a word of discussion of it appears in the briefs. The original ballots were not before this Court, but there are samples of them in the record. Exhibit No. 20 is marked with a cross above the headings of all the columns except the Reupbncan column, and Dunlevy's name is transferred to the Rcpublican column, and his competitor's name stricken out of it. No. 21 is marked with a cross above the heading of each of the columns except the Democratic column. No. 40 is marked with two large crosses in each of the columns except the Republican column, and Davis' name is stricken out in that and Dunlevy's inserted, and the crosses are large enough to cover all the names except one in every column. No. 41 is marked with lines drawn through all the columns except the Republican, and Dunlevy's name is transferred to that column and Davis' stricken out, but the defacing lines do not reach throughout the entire length of the columns, the names of the congressional candidates only being not covered by the lines. No. 42 shows all the columns defaced except the Prohi-

bition column, by lines drawn from the top to the bottom. Dun-
levy's name is transferred to that, but is not in the blank space
under the name of his competitor. In No. 43 every name in
every column except the Democratic column is marked out. In
No. 45, all of the columns except the Republican column are
defaced by five crosses made in each of them and practically cov-
ering every name on them. In the Republican column Davis'
name and the designation of the office for which he was a candi-
date are marked out and Dunlevy's name written in the blank
below. In No. 46, all of the columns, except the Republican, are
defaced by lines drawn from the top to the bottom and Dunlevy's
name transferred as in No. 45. No. 47 is substantially like No.
41. In No. 48, all of the columns, except the Democratic, are
defaced by lines drawn from the top to the bottom with an ordi-
nary lead pencil. No. 49 is substantially like No. 41, except
that the Democratic instead of the Republican column is unde-
faced and only one of the lines fails to be the full length of the
column, thus leaving the name of the Republcian candidate for
congress undefaced. No. 50*b* has all the columns except the
Republican defaced by lines drawn from the top to the bottom
and Dunlevy's name transferred to the Republican ticket. It
appears that in every one of these samples, representing the bal-
lots in question in the *Dunlevy Case,* there was a clear intention
shown on the part of the voter to vote one column as his ballot
and deface every other column on the sheet; and they were so
marked as to clearly show they had not been voted. JUDGE
BRANNON was, therefore, entirely correct in saying, in the *Mor-
ris-Wertz Case,* that this question did not arise in the *Dunlevy
Case.*

Is it covered by the principle laid down in the *Dunlevy Case?*
If, in reading the syllabus of that case, it is borne in mind that
the word ballot means column, and does not mean ballot sheet,
it will be seen that there is no conflict between it and the prin-
ciples laid down here or the law as announced in the *Morris-
Wertz Case.* It relates to the counting of the ballots by the
voter. It is or should have been a construction of section 66 of
the act of 1891 and not of section 34, the provisions of the latter
section, here involved, having been obeyed by the voters in pre-
paring their ballots. It simply reiterates what section 66 means,
namely, that if it is possible to ascertain from the ballot what

the intention of the voter was, it should be counted, presupposing, as section 66 necessarily does, that the voter has prepared his ballot as directed in section 34, and as, in fact, he had in the *Dunlevy Case,* and that the names of all persons for whom he has voted are in one list or column. In that section the word ballot can mean nothing but the column. It is not operative until after the voting is done. It presupposes that the voting was done according to law and that all the columns except one had been defaced. As applied to the column it is directory, although it is not affirmatively stated to be so in the section. If the voter has placed the names of all persons for whom he offers to vote in one column, and has thus prepared his ballot his vote should be counted, if his intention can be ascertained from that ballot, although he may not have written the names in the exact places in the column designated by the statute.

But it is claimed that, if the statute is mandatory, then it abridges, or unreasonably impedes, the constitutional right of the citizen to vote, and is, therefore, unconstitutional. To what JUDGE BRANNON has said on this subject, nothing need be added. To the same effect the following is quoted, however, from Cooley's Cons. Lim. 757: "All such reasonable regulations of the constitutional right which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression and to preserve the purity of the ballot-box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them absolutely essential." What is unreasonable in this regulation? It is one of the most easily understood systems of voting known. It is, as has been shown, the old system under which we have voted ever since the organization of the State, worked over, modified, and, in fact, simplified.

The next question is whether the petitioner has mistaken his remedy. This Court has decided in numerous cases that *mandamus* does not lie, at common law, except in purely ministerial matters. *Board v. Minturn,* 4 W. Va. 300; *State v. County Court,* 33 W. Va. 389, (11 S. E. 72) ; *Miller v. County Court,* 34 W. Va. 285; *State v. Herrald,* 36 W. Va. 721; *Marcum v. Ballot Com.,* 42 W. Va. 263; *Satterlee v. Strider,* 31 W. Va. 781. But it was held in *Marcum v. Ballot Commissioners,* cited, that, "Section 89 of chapter 3 of the Code, as re-enacted in chapter

25, Acts 1893, in cases involving duties of ballot commissioners under said chapter, gives the writ of *mandamus* more scope than at common law, rendering it a process to control them as to all acts ministerial or judicial." In *Dunlevy* v. *County Court*, 47 W. Va. 513, (35 S. E. 956), this Court held: "While *mandamus* is the proper, legal and efficacious remedy provided by the statute for the purpose of compelling the election officers to discharge their duties in conformity with the law, when such officers, in violation of their ministerial duties, assume the exercise of judicial functions, *certiorari* may be resorted to for the purpose of reviewing their erroneous rulings, although *mandamus* would furnish more speedy, less expensive, and more adequate relief." In the *Morris-Wertz Case,* the question of the propriety of the writ was not raised nor passed upon, but the court decided the case upon its merits. Section 89 of chapter 3 of the present Code provides that "Any officer or person upon whom any duty is devolved by this chapter, may be compelled to perform the same by writ of *mandamus.* The circuit courts or the judges thereof in vacation, shall have jurisdiction by such writ, and shall, upon affidavit filed, showing a proper case without a rule to show cause, issue such writ, to be returned, heard and determined without unnecessary delay." The board of canvassers are officers upon whom said chapter devolves the duty, among other things, of opening and examining and recounting the ballots, upon the demand of any candidate voted for at the election, the returns of which they are canvassing, and, after having done that, to declare the result of the election and issue certificates to the person voted for showing the result. The language of the statute conferring this jurisdiction by *mandamus* is general. It says any officer may be required by that writ to perform any duty required of him by said chapter. But, at common law, it might have been invoked to compel any inferior court, board or tribunal to act, but not to control or reverse the action of such court, board or tribunal, or of an officer, where such action is one involving discretion, judicial or *quasi-judicial;* but only where such action is merely ministerial. *Marcum* v. *Ballot Commissioners,* cited. Is the recounting of votes by the board of canvassers a judicial or ministerial function? In *Brazie* v. *Commissioners,* 25 W. Va. 213, JUDGE SNYDER says: "It is the duty of the county commissioners to determine, ministerially, the result, but necessarily, by the exercise of discretion

and judgment. They must first determine that the ballots, poll books and certificates before them are genuine, and that they are certified in form and manner substantially according to the requirements of the statute, to correct and put or have them put in form if they are not so, and that they are, in fact and in law, the returns of the election. This involves the exercise of *quasi-judicial* power. While the duties and powers of the commissioners are mainly ministerial, they are *quasi-judicial,* so far as it is their duty to determine, whether the papers laid before them by the clerk and purporting to be returns are in fact such genuine, intelligible and authenticated returns as are required by law. To the extent here indicated a judgment in the nature of a judicial function is necessarily exercised; for, if it be otherwise, the whole law is inoperative in respect to the power of the county commissioners to do any act whatever. But aside from these judicial functions, the commissioners possess no discretionary powers, their duties are purely ministerial." While the action of the board in determining whether a ballot is illegal by reason of its informality or otherwise, is not specifically named in the foregoing quotation as a judicial function, it certainly involves the exercise of as much discretion and judgment as the other acts specifically mentioned, but it requires no extraneous evidence. Judge Cooley says: "The several boards act for the most part in a ministerial capacity and are not vested with judicial powers to correct the errors and mistakes that may have occurred with any officer who preceded them in the performance of any duty connected with the election, or to pass upon any disputed fact which may affect the result. Each board is to receive the returns transmitted to it, if in due form, as correct, and is to ascertain and declare the result as it appears by such returns; and if other matters are introduced in the returns than those which the law provides, they are to that extent unofficial and unauthorized, and must be disregarded. If a district or State board of canvassers assumes to reject returns transmitted to it on other grounds than those appearing upon its face, or to declare persons elected who are not shown by the returns to have received the requisite plurality, it is usurping functions, and its conduct will be reprehensible, if not even criminal. The action of such boards is to be carefully confined to an examination of the papers before them, and a determination of the result therefrom, in the light of such facts of public notoriety connected with the elec-

tion as every one takes notice of, and which may enable them to apply such ballots as are in any respect imperfect to the proper candidates or offices for which they are intended, provided the intent is sufficiently indicated by the ballot in connection with such facts, so that extraneous evidence is not necessary for this purpose. If canvassers refuse or neglect to perform their duty, they may be compelled by *mandamus.*" Cooley's Cons. Lim. 782. This author also carefully marks the distinction between those acts which involve extraneous inquiries and evidence and those which do not, but fails to say whether the function in question is ministerial or judicial. In *Dunlevy* v. *County Court,* cited, JUDGE DENT, delivering the opinion of this Court, said "When the legislature re-enacted the election law of this State in 1891, it undoubtedly intended to take away all judicial functions from the election officers, and by careful provision make all their duties purely ministerial, subject to the control of the writ of *mandamus.*"

Whether, at common law, the ascertainment and declaration of the result from the returns, including the ballots, upon a recount, is judicial or ministerial, it seems to have been the intention of the legislature to render that duty ministerial only, or to change the nature of the writ of *mandamus* and make it applicable to all the duties of election officers, whether judicial or ministerial, and to enlarge the scope of the writ of *mandamus* and, as to the latter duties, make it operate as a *certiorari,* and thus summarily review the action of such officers. This is undoubtedly true as to the duty of a board of canvassers in respect to some offices, if certain portions of the section are to have any meaning. Section 89 proceeds thus: "If a circuit court or a judge thereof in vacation, shall proceed against any board of canvassers by *mandamus,* or otherwise, to *control,* in any manner the action of said board in the *performance of its duty,* under the provisions of section 68 of this chapter, in any case concerning the election of a member of the house of delegates, or a State senator, and shall fail to enter a final order in such proceedings, *settling all questions presented therein,* within fifteen days from the commencement of such proceedings, unless delayed by proceedings of the Supreme Court of Appeals, or a judge thereof in vacation, the same shall be dismissed." In another place this section reads "A *mandamus* shall lie from the Supreme Court of Appeals, or any one of the judges thereof in

vacation returnable before such Court to compel any officer herein to do and perform *legally* any duty herein required of him." If, by *mandamus,* a circuit court may *control* the action of the board of canvassers "in the *performance* of its duty, under the provisions of section 68," respecting the election of a member of the house of delegates or a State senator, it can most assuredly do so in respect to any other officer. If the writ of *mandamus* will lie from the Supreme Court to compel such officers to perform *legally* their duty, no reason is perceived why the legislature should not have intended the writ to operate in the same way when issued by a circuit court or a judge thereof in vacation. While there have been some expressions of doubt as to the jurisdiction, this Court has declared in two cases, that *mandamus* is the proper remedy, and, in another, has exercised the jurisdiction. The question being one of remedy, these precedents ought to be regarded as conclusive of it.

Another contention is that, as the board of canvassers, at the time of the issuance of the writ, had completed the recount, declared the result, issued a certificate of election and finally adjourned, such writ, even if proper during the progress of the recount or before the completion thereof, was then improper because the board was then *functus officio.* Upon this question Judge Cooley says: "Though as these boards are created for a single purpose only, and are dissolved by an adjournment without day, it has been held that, after such adjournment, *mandamus* would be inapplicable inasmuch as there is no longer any board which can act. But we should think the better doctrine to be, that if the board adjourn before a *legal and complete* performance of their duty, *mandamus* would lie to compel them to meet and perform it." Cooley's Cons. Lim. 784. The case of *Rosenthal* v. *Board of Commissioners,* 19 L. R. A. 157, is cited by counsel for plaintiffs in error in support of this contention. In that case, the clerk of the county court, in transmitting the returns to the State board of canvassers, by accident, mistake or design, transposed the totals of the votes received by two opposing candidates for the house of representatives, and thereby certified that the man, who had not been elected, had been. Before this mistake was discovered, the State board of canvassers met and canvassed the returns, including this wrong abstract, declared the result and finally adjourned. About three weeks after the adjournment, the clerk of the county court sent

up another certificate with the correct returns, stating that his former abstract was incorrect and erroneous. The supreme court of Kansas held that *mandamus* would not lie, to compel the board to reconvene and correct this mistake, because it had legally and completely performed its duty, for the reason that it had acted upon the returns from all the counties and without any notice of any error in any of them. So far as the members of the board knew the certificate from the county in question was correct. But the court says "If no abstract from Haskell county had been received by the secretary of state before the final adjournment of the board, on December 1, 1892, and if the state board had had no abstract or returns before them, from Haskell county, to act upon, it is possible that under the decision of *Lewis* v. *Marshall County Commissioners,* 16 Kan. 102, *mandamus* would lie, upon the ground that only a partial canvass had been made. But that is not this case." The court goes on and remarks that the abstract was incorrect but had come from the proper officer, was signed and certified by him, was duly authenticated by him, was not challenged or objected to, and there was nothing in the returns or in the manner in which they were transmitted or received, to cause suspicion, or to demand any other action thereon than is usual and customary in such cases. Here is a plain intimation from that court that if it had been shown that the state board of canvassers had not legally performed their duties, *mandamus* would have applied, and they could have been reconvened thereby and compelled to do their duty. In *Alderson* v. *Commissioners,* 32 W. Va. 454, the proceeding was by *certiorari* and this defense was there set up, but the Court held that it was untenable and that the board could be reconvened and the cause remanded to them for further proceedings, although they had finally adjourned.

These views result in the conclusion that the provisions of section 34 of chapter 3 of the Code, requiring the names of all persons, for whom the voter desires to vote, to be in one of the columns on the ballot sheet, are mandatory, that any departure therefrom invalidates the ballot, that the writ of *mandamus,* from a circuit court or a judge thereof in vacation, lies to compel a board of canvassers to perform legally its duties, and that, by such writ they may be reconvened, after adjournment, and compelled to correct errors committed by them in the discharge of their duties. The judgment and order of the circuit court

òf Fayette County, entered in this case, December 3, 1900, must, therefore, be affirmed.

*Affirmed.*

DENT, JUDGE, (*dissenting*) :

I cannot concur in defeating the plainly expressed will of the people, unless in submission to a positive unequivocal enactment of the legislature, as to the meaning of which reasonable minds learned in the law cannot differ. In cases where the legislative enactment is evidently susceptible of two constructions, depending on the political bias of the construing mind, the will of the people should solve all doubts in their favor.

This is a case strictly of this character.

The legislative enactment being uncertain and silent wherein it could easily have been made certain and positive the people took the advice of those learned in the law and followed it. The returns of the precinct commissioners and the ascertainment of the canvassing board, on recount demanded, showed the election of the Democratic candidate by a fair majority over the Republican. The will of the people was plain. The circuit judge, however, proceeded to overthrow it, not because from the face of certain ballots the choice for sheriff was not plain, but because the voter had permitted the names of certain candidates for offices, in nowise affecting the sheriffalty, to remain in the Republican column, unerased. Thereby holding, that because the voters did not erase all the names of the candidates for all the officers in the Republican column their votes could not be counted for sheriff, although they did erase the name of the Republican candidate and plainly indicated their intention to vote for the Democratic candidate.

The judge then proceeds to reject a sufficient number of votes to change the result of the election.

Thus is the will of the people nullified and the will of the circuit judge substituted therefor.

This Court sustains the finding of the circuit judge rather than that of the election officers.

No reasoning however learned, specious or often repeated, can make wrong right or right wrong, although because of the tem-

porary power of the reasoner it may place "right upon the scaffold and wrong upon the throne."

It is conceded in the court's opinion that the construction of the law by the election officers, charged with the duty of executing it, should not be overruled except for cogent reasons.

The word cogent here used may be made to mean just, that is consistent with abstract justice; or merely plausible, justified by political expediency.

The latter meaning is often confounded with the former by him whose mental bias is such that he is unable to discriminate between them. This may result from a defect of judgment rather than an error of the heart and be the outcome of pure or selfish motives.

Some persons are totally incapable of administering abstract justice when they have any interest at stake however remote. They are to be pitied, with a fellow-feeling pity, rather than condemned, for they labor under a natural mental blindness which prevents a clear conception of the truth.

For this cause the uniform decisions of the courts of all lands, from the highest to the lowest, have tacitly established a rule of practice as firmly as any rule of law and this is that in all political cases a political conclusion if plausible will prevail over abstract justice.

There have been notable exceptions to this rule sufficient in number to prove it, but they are not so numerous as the stars in the heavens or the sands on the seashore.

Whether this case comes under the rule or the exception is for the people to decide. Ordinary courts cannot be expected to arise to such sublime heights of justice. To do so is to court political martyrdom at the hands of political associates. Occasionally an exalted attempt is made to overthrow the rule only to result in wormwood and gall. The people act on it presumptively, yet when an opportunity affords they sometimes administer a wholesome rebuke to its too strict adherents, while lesser offenders may go unpunished or apparently receive a rich reward for party fealty. Such is human justice. And as such it must be accepted and submitted to until the time of the restitution of all things when the crooked shall be made straight, for to overcome it is a superhuman task. When men learn that to do

justice is better than to win victories by injustice, this rule will perish, but not until then.

It is better than that confusion should continue to prevail in our elections, that the questions here raised should be settled according to precedent, though settled unjustly, although it is better still if they are settled justly.