# Richmond.

## S. A. XIPPAS V. COMMONWEALTH.

### January 15, 1925.

1. CRIMINAL LAW—*Statutory Crimes—Indictment Failing to Charge Offense— Award of New Trial by Appellate Court Though no Motion Made in Arrest of Judgment.*—It is unquestionably true that before an accused can be convicted of the violation of a statute, the crime charged must fall within the provisions thereof. It is also true that where no offense is charged in an indictment, the appellate court will reverse the judgment of the trial court, set aside the verdict of the jury, and award a new trial, even though no motion was made in arrest of judgment.

2. ELECTIONS—*Primary—Giving Away Ballots—Indictment.*—Upon a prosecution under section 167 of the Code of 1919, for giving away official ballots, it was objected that the indictment failed to allege or show that the election in question was held under authority of law, or that it was such an election as the law applied to. The indictment alleged that it was "a certain primary election held in the city of Norfolk on August 7, 1923." The naming of the date in the indictment, on which the primary was held, following the use of the words "said election," left no room for doubt that the primary referred to was the primary provided by section 223 of the Code of 1919, to be held on the first Tuesday in August to nominate candidates to such offices as are set forth in section 222 of the Code.

   *Held:* That there was no merit in the objection and that it was not necessary to allege in the indictment that the primary was held according to law.

3. PRESUMPTIONS AND BURDEN OF PROOF—*Knowledge of Law—Primary Law—Case at Bar.*—In the instant case, an indictment under section 167 of the Code of 1919, for giving away official ballots, it was a presumption of law that the accused was cognizant of the fact of the existence of the primary law which had been in force for many years.

4. ELECTIONS—*Primary—Definition—Provided for by Law.*—In a strict legal sense, the only primary which may be held in Virginia is the one provided for by law. There may be various modes adopted for ascertaining the will of the people upon sundry questions, but they cannot be denominated primaries. A primary, under the law of Virginia, relates to the nomination of a candidate, by a political party, for a certain office.

5.  ELECTIONS—*Section 167 of the Code of 1919—Giving Away Official Ballots—Giving Away on the Day Before Election—Case at Bar.*—In the instant case, an indictment under section 167 of the Code of 1919, for giving away official ballots, the indictment charged the defendant with giving away, on the 6th of August, three official ballots for an election to be held on the 7th, it was contended that section 167 of the Code of 1919 applied only to acts done on the day of the election.

    *Held:*   That the first offense described in section 167, namely, crowding upon the public highway within 100 feet of the voting place, applies to offenses committed upon the day of the election, while the latter offense in this section as to giving away or selling official ballots is not limited in its scope to the day of election, but is expressly intended to include any day on which the act done may affect the secrecy, regularity, fairness, or purity of the election or primary to be held, at which said official ballot is to be used.

6.  ELECTIONS—*Primary Election—Giving Away Official Ballots—Application of Section 167 of the Code of 1919 to Primary Election.*—Section 224 of the Code of 1919 provides that all provisions of the Code in so far as they relate to crimes against "the electoral franchise" shall be applicable to primaries.

    *Held:*   That section 167 of the Code of 1919, forbidding the giving away or selling official ballots, applies to a primary election.

7.  STATUTES—*Construction—Codes—Past Enactments.*—In order to comprehend the meaning of the revisors, the Supreme Court of Appeals is permitted to consider past enactments relative to the same subject matter, if there is a substantial doubt as to the meaning.

8.  ELECTIONS—*Primaries—Section 224 of the Code of 1919—Stare Decisis—"Electoral Franchise."*—The Supreme Court of Appeals is not bound by the construction of the term "electoral franchise" by courts of other jurisdictions.   The court not having previously construed the term is at liberty to so construe it as to give effect to what it believes was the legislative intent as expressed in the various statutes dealing with primary elections, and is of the opinion that when the revisors of the Code of 1919 inserted the words "electoral franchise" in section 224 relating to primaries, they did not mean to use this term in a restricted sense, but meant the language employed to embrace all crimes, in so far as they related to elections and legal primaries.

9.  ELECTIONS—*Section 167 of the Code of 1919—Indictment Charging the Giving to Another of Three "Official Ballots."*—In the instant case the indictment charged the offense of giving to another three "official ballots."   The ballots in question were not printed under the supervision of a designated member of the electoral board, sealed by the board and by resolution declared to be the official ballots for the election to be held.

*Held:* That the ballots were not "official ballots" and, therefore, the proof failed to support the allegation of the indictment.

10. Elections—*Statutes Relating to Printing, Counting, etc., of Ballots Directory or Mandatory.*—While statutes regulating elections are most frequently construed to be directory and the provisions relating to printing, counting, sealing, certifying, and delivering the ballots are to be so construed in a case affecting the right of a voter to cast his vote, or affecting the result of an election because of the mistake or misdeed of a member or members of the electoral board, or other election officer, yet when the Commonwealth is seeking to incarcerate in jail one of its citizens for violating one of the provisions of the election law, the rule of construction is not the same and the provisions of the primary law in regard to the ballot when invoked for the punishment of a crime are mandatory.

11. Elections—*Electoral Board—Counting and Sealing Ballots—Delegation of Power.*—To hold that the electoral board may delegate its power as to counting, sealing, etc., of ballots in any and all events would be to destroy the legislative intent in regard to the protection of the ballots.

Error to a judgment of the Corporation Court of the city of Norfolk.

*Reversed.*

The opinion states the case.

*John N. Sebrell, Jr.,* and *Edward W. Wolcott,* for t he plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile, Assistant Attorney-General,* and *Lewis H. Machen, Assistant Attorney-General,* for the Commonwealth.

Campbell, J., delivered the opinion of the court.

The accused was tried and convicted upon an indictment (omitting the formal parts) reading as follows: "That S. A. Xippas, on the 6th day of August, in the year 1923, and before said election, in the said city of

Norfolk did unlawfully give to L. J. Floum three official ballots printed and sealed by the electoral board of the city of Norfolk for use at a certain primary election held in said city of Norfolk on August 7, 1923, the giving of said ballots to the said L. J. Floum by the said S. A. Xippas not being then and there authorized by law as provided for by chapter thirteen of the Code of Virginia, against the peace and dignity of the Commonwealth."

The statute under which the indictment was drawn, reads as follows:

"Section 167.   Crowds forbidden; counterfeit ballots.—It shall not be lawful, upon the day of election, for persons to congregate and crowd upon the public highway within one hundred feet of any of the voting places, and any person violating the provisions of this section shall, upon conviction thereof, pay a fine of twenty-five dollars or be confined in jail not exceeding ten days.   Any member of the electoral board, the printer who shall print the official ballots provided for by this chapter, any judge of election, or any person who shall sell or give to any person whomsoever, except where it is distinctly provided by this chapter, any official ballot, or copy, or any *facsimile* of the same, or any information about the same, or shall counterfeit, or attempt to counterfeit, the same, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined five hundred dollars and imprisoned in jail six months.   It shall be the duty of the judges of election to see that the provisions of this section are strictly carried out."

[1, 3] The first assignment of error is to the action of the court in overruling the demurrer to the indictment and the motion to quash the same.   The first objection urged is that the indictment fails to allege or show that

the election was held under authority of law, or that it was such an election as the law applied to.

It is unquestionably true that before an accused can be convicted of the violation of a statute, the crime charged must fall within the provisions thereof. It is also true that where no offense is charged in an indictment the appellate court will reverse the judgment of the trial court, set aside the verdict of the jury and award a new trial, even though no motion was made in arrest of judgment. *Rose's Case*, 116 Va. 1027, 82 S. E. 699.

The objection relied on is without merit. The indictment alleges that it was "a certain primary election held in the city of Norfolk on August 7, 1923." The primary law under the provisions of which candidates are nominated for certain specified offices, in one form or another, has been in force for many years. It is a presumption of law that the accused was cognizant of the fact that such a statute was in existence.

The question is asked in the brief of counsel for accused, "was it an election held under the law of Virginia, or was it some election not authorized by law?" If there was any doubt in the mind of the accused at the time he was put upon his trial, as to whether the primary in which the ballots were to be used was a primary held under the law, or merely a private affair, all that was necessary to obviate any obscurity (if any existed in the indictment) was to call for a bill of particulars. If, upon the filing of the bill of particulars, it had developed that the so-called primary held was purely private, of course there would have been no violation of a statute which did not embrace such so-called private primaries.

As a matter of fact, the naming of the date in the indictment, on which the primary was held, following the

use of the words "said election," left no room for doubt that the primary referred to was the primary provided by section 223 of the Code of 1919, to be held on the first Tuesday in August to nominate candidates to such offices as are set forth in section 222 of the Code.

[4] In a strict legal sense, the only primary which may be held in Virginia is the one provided for by law. There may be various modes adopted for ascertaining the will of the people upon sundry questions, but they cannot be denominated primaries. A primary, under the law of Virginia, relates to the nomination of a candidate, by a political party, for a certain office. Construing the word primary, section 221 of the Code does so as follows: "The words and phrases in this chapter (chapter 15, under the title primary elections), unless inconsistent with the context, shall be construed as follows: (a) The word 'primary,' the primary elections provided for by this chapter."

In this chapter of the Code it is also provided that the electoral board shall provide the ballots to be used in the primary; how the same shall be cast, counted and certified; how contests conducted; qualifications of those voting; vote required to nominate; expenses of candidates; penalties for violating provisions of primary law, etc. So far as we have been able to ascertain, there is no provision in our law, as exists in some of the States of the Union, for conducting a primary as distinguished from an election on any question, other than the one adverted to, to-wit: Nomination of candidates.

Therefore, it was not necessary to allege in the indictment that the primary was held according to law.

[5] The second objection urged is that the demurrer should have been sustained, for the reason that the indictment charges the defendant with giving, on the *sixth* of August, three official ballots, for an election to

be held on the *seventh.*    The contention being that section 167 of the Code, *supra,* applies only to acts done *on the day of election.*

The language of the statute relied on to support this conclusion is as follows: "It shall not be lawful upon the day of election," etc.    "It shall be the duty of the judges of election to see that the provisions of this section are carried out."    The argument of the learned counsel in his petition for a writ of error is that "the purpose of the statute is to prevent fraud in the election, either by the substitution of one for the other, the voting of more than one ballot, or the improper influencing or aiding voters at the election.    There is nothing sacred about the piece of paper, denominated a ballot, like there was about the Ark of God, whose mortal touch by Uzzah brought death to that unfortunate son of Abinadad.    The statute was intended to prevent fraud on election day.    And, unless it contemplates acts only on the day of election, the giving of a ballot after the election had terminated would be a violation of the statute. Surely such was not intended.    If so, for what reason?    The statute could not mean that the giving another an official ballot at any or at all times is an offense.    There could be no reason nor purpose in such a statute.    It must, and does, mean the giving of the ballot at some particular time, that is, on election day."

This objection is also without merit.

The most casual reading of the statute reveals the fact that it contains two grades of offenses, viz:    (a) Making it unlawful "for persons to congregate and crowd upon the public highway within one hundred feet of any of the voting places," under penalty of a fine of twenty-five dollars, or confinement in jail not exceeding ten days; (b) making it unlawful for any member of the

electoral board, the printer who shall print the official ballots provided for by this chapter, and judges of election, or any person, to sell or give to any person whomsoever, except where it is distinctly provided by this chapter, any official ballot or copy, or any *facsimile* of the same, or any information about the same, or to counterfeit, or attempt to counterfeit, the same, under penalty of a fine of five hundred dollars and imprisonment in jail for a period of six months.

The intention of the law was to secure regularity in the conduct of elections and primaries, to secure fairness in elections and primaries, and to prevent and punish any corrupt practices in connection therewith.

We must interpret the legislative intent, as expressed by the language the legislature has used, in connection with the object sought to be obtained. It must be conceded that the statute is not free from objection, by reason of the two classes of crimes which it seeks to punish. On the other hand, it is inconceivable that the legislature intended to punish a person by fine and imprisonment for the selling or giving to any other person any official ballot, or copy or *facsimile* of the same, or counterfeit thereof, upon election day, and at the same time intended that the same acts, if committed on a day prior to the election, should not constitute a violation of law.

Our construction of the statute is that the first offense described therein applies to offenses committed upon the day of the election, and included the general public, while the latter offense applies to those acts done by members of the electoral board and other individuals, as set forth in the statute, and is not limited in its scope to the day of election, but is expressly intended to include any day on which the act done may affect the secrecy, regularity, fairness or purity of the election or primary to be held, at which said official ballot is to be used.

[6-8] The third objection to the indictment is that section 167 of the Code, does not apply to primary elections. In this contention we are unwilling to concur. In section 224 of the Code of 1919 it is there provided as follows: "All the provisions of this Code, in so far as they relate to crimes against the electoral franchise, are hereby made applicable to primaries, except when inconsistent with this chapter."

The correct construction of this provision depends upon the answer to the question, what is meant by a crime against the electoral franchise? Are the terms "elective franchise" and "electoral franchise" synonymous, and did the revisors of the Code so intend? In reviewing the history of the primary law in Virginia, we find the words "electoral franchise" appear for the first time in Code revision of 1919. In the Acts of 1902-3-4, page 933, appears the provision that:

"All laws intended to secure regularity and purity of general and local elections and to prevent and punish any corrupt practices in connection therewith, and the penalties and punishments hereafter prescribed by law for such offenses, shall, so far as they may be applicable, apply to all primary elections, whether the same be held under any statute law of this State, or under a plan provided by some political party."

We are inclined to the belief that this language is the foundation for the following sentence in section 224 of the Code of 1919:

"All the provisions and requirements of the statutes of this State in relation to the holding of elections, the counting of ballots, the making and certifying of returns, and all other kindred subjects, shall apply to all primaries insofar as they are consistent with this chapter."

In order to comprehend the meaning of the revisors we are permitted under our decisions to consider past enactments relative to the same subject matter.

As said by Judge Riely, in *Gaines' Adm'r* v. *Marye*, 94 Va. 225, 26 S. E. 511:

"The Code is a revision of the statute law of the State as it existed at the time of the revision.   It was adopted by the legislature as one act, and all its parts took effect equally and simultaneously.   Notwithstanding the fact that the Code is a revision of the statute law, if its various sections are harmonious and their meaning plain, resort cannot be had in construing them to the original statutes to see if any error was committed in the revision.   Where harmonious and their meaning clear, they speak for themselves, and must be interpreted and given effect as revised.   If, however, there is a substantial doubt as to their meaning, the law which was the subject of the revision may be looked to in ascertaining their meaning.   If they are inconsistent and cannot stand together, the original statutes, and the respective dates of their enactment, may be examined to see what was the last expression of the will of the legislature on the subject."

In the case of *Parks* v. *State*, 100 Ala. 634, 13 So. 756, the Supreme Court of Alabama defined elective franchise as follows:   " 'Elective franchise' is the right or privilege of a qualified elector or voter to cast his ballot freely in favor of the man of his choice in an election authorized by law to be held."

Some textwriters have likewise adopted this as the definition of "electoral franchise."   This court not having previously dealt with this subject, we do not feel bound by the construction placed upon the term by courts of other jurisdictions, but are at liberty to so construe it as to give effect to what we believe was the legislative intent as expressed in the various statutes dealing with primary elections.   We are, therefore, of opinion that when the revisors of the Code of 1919 inserted the

words "electoral franchise" in section 224 relating to primaries, they did not mean to use this term in a restricted sense, but meant the language employed to embrace all crimes in so far as they related to elections and legal primaries.

[9, 10] The second assignment of error challenges the ruling of the trial court in refusing to set aside the verdict of the jury as contrary to the law and the evidence, and as being without evidence to support it, for, it will be observed, the accused was not indicted and tried for the offense of giving to another person copies or *facsimiles* of the official ballot, as he might have been under the statute, but for the offense of giving to another "three official ballots."

The precise contention is that the evidence does not show that the ballots alleged to have been given by defendant to Floum were official ballots.

The main facts and circumstances as presented by the Commonwealth are thus gathered from a summary of the same in the petition for a writ of error, and are conceded to be substantially correct:

"The defendant, between eleven and twelve o'clock of the morning of August 6, 1923, gave to one Floum three ballots, similar to the ballots used in a primary election held on the following day, August 7th, with the exception that the official ballot used in the election bore two impressions of the seal adopted by the electoral board, while the three ballots in question bore only one impression of the seal.  The ballots for use in the election had been printed by Farant, Incorporated, some time before, in the absence of any member of the electoral board and without having taken the oath required by law.  The clerk of the electoral board, with the consent of one other member thereof, had delivered the seal of the electoral board to the printer who likewise, in the ab-

sence of any member of the board, impressed the seal on the ballots which had been printed. There were many employees of Farant, Incorporated, who had access to the ballots and to the seal. After the ballots had been thus printed and impressed with the seal, an employee of Farant, Incorporated, counted them, wrapped them in packages, and sealed the packages with mucilaged strips and delivered them to the clerk of the electoral board, who kept them securely locked, thus wrapped. and sealed, in an iron safe of the electoral board, the combination of which was known only to him and the general registrar.

"Both the clerk of the electoral board and the general registrar, as witnesses for the Commonwealth, testify that these packages, after the three ballots were in the possession of Floum, were just as they had been delivered to the clerk of the electoral board, the seals thereon were unbroken, and that no ballots had been abstracted from any of the packages, and that it was impossible that they could have been.

"Some few of these packages, after twelve o'clock of the 6th, were delivered to certain judges of election, wrapped with the poll books and other necessary equipment for the election. This was, however, after Floum was in the possession of the three ballots. And these ballots thus delivered to the judges were subsequently returned in the same condition in which they had been given to the judges.

"Floum, on receiving the three ballots in question, took one to each of the afternoon newspapers and the third he carried to the clerk of the electoral board. The electoral board convened, for the first time since the printing of the ballots, recalled the few packages which had been delivered to certain judges of election, and then proceeded to stamp all the ballots with two im-

pressions of the seal and adopted a resolution declaring only such ballots as bore the double impression of the seal to be the official ballots for the election. Prior to this time 161 of the ballots which had been printed and stamped with the seal by the printer had been delivered to the general registrar to be sent by mail to absent voters. These were subsequently accounted for, as were, in fact, all that had been printed, stamped, and delivered to the clerk of the electoral board."

The verdict of a jury—reinforced by the pronouncement of judgment thereon by the trial court—might figuratively be termed the ward of the appellate court, so loath has this tribunal been to disturb the same.

The relation in which the appellate court stands towards the verdict of the jury, has been clearly stated by Judge Burks in *Blair* v. *Wilson*, 28 Gratt. (69 Va.) 165, as follows:

"Every reasonable presumption should be made in support of a verdict of a jury fairly rendered, and according to the long established, well settled rule of this court, such a verdict cannot be set aside as against the evidence, unless there is a plain deviation—unless the evidence is plainly insufficient to warrant the finding." Therefore, to sustain the verdict in this case, the burden is on the Commonwealth to prove by satisfactory evidence beyond all reasonable doubt that the three ballots, alleged to have been given away by the defendant, were official ballots."

It was the province of the court to define an official ballot and this the court has done by giving to the jury the following instruction:

"The court instructs the jury if the three ballots in question had been printed along with other ballots in accordance with the direction of at least two members of the electoral board, and had been stamped with the

official seal of the electoral board in accordance with the direction of the said two members of said board, and were intended by said two members of the electoral board for use as ballots in the democratic primary to be held in the city of Norfolk on the 7th day of August, 1923, they were official ballots, notwithstanding the fact that the electoral board, or any member thereof, failed to comply with one or more provisions of law governing the preparation of said ballots."

In thus defining an official ballot, it was the opinion of the trial court that the various provisions of the statutes relating to printing, counting, sealing, certifying and delivering the ballots were merely directory and that even the acts imposed directly upon the electoral board, such as counting and sealing the ballots, might be delegated to some other person by the clerk of the board, and if approved or consented to by one other member of the board, it was sufficient to meet the requirements of the statute.

The duties imposed upon the electoral board are found in section 158 of the Code, which provides *inter alia:*

"It shall be the duty of the electoral board to procure and adopt a seal, if there be not one already adopted by the electoral board of such city or county, which seal may be changed from time to time in the discretion of the board, and shall not be less than two inches in diameter. Said board shall meet as soon as convenient after the printing of the ballots, as provided for in this chapter, of which meeting the chairman of the board of supervisors of the county or the commissioner of accounts of the corporation or circuit court of the city, shall be notified, and at which there shall be present the said chairman or commissioner and the members of the said board, but no other person; and in the event

of the inability, through sickness or other incapacity, of the said chairman or either of said commissioners to discharge any of the duties imposed by this section, it shall be lawful for the said duties to be performed by some other member of the board of supervisors of said county, or the commissioner of accounts of the corporation or circuit court of some other city.   At this meeting the members of the board who shall have secured from the printer the ballots as required by section one hundred and fifty-six shall deliver said ballots to said board.   The ballots shall then be carefully counted by said board and the number thereof entered by the secretary of the board in a book provided by him and kept for such purpose.   The board shall affix its seal to every ballot printed as above provided, upon the side reverse from that upon which the names of the candidates appear, and said chairman or commissioner shall thereupon enter of record upon the minutes of the electoral board an affidavit stating that said ballots were counted and sealed in his presence in the manner prescribed by law.

"The secretary of said electoral board shall keep in his sole custody the seal or stamp of said board and in a sealed package, to be opened only in the presence of the electoral board or the commissioner of accounts of the corporation or circuit court when in the discharge of their duties as prescribed by this chapter."

The single question then, under this phase of the assignment of error, depends upon the answer to the query: Did the court correctly instruct the jury?

It must be conceded that not only were the requirements of section 158 disregarded, but also the requirements of section 156, relating to the oath of the printer and the continuous presence of the member designated by the board to be present while the ballots were being

printed.   It is to be observed that the ballots were in the hands of the defendant at eleven thirty on the morning of the sixth day of August; that the action of the electoral board in regard to stamping a second seal on the same was taken some time thereafter.

In our investigation of the questions involved, we find numerous decisions dealing with the election laws of the various States of the Union, but in none of them do we find any discussion applicable to the question before us.   In these decisions the great weight of authority is to the effect that statutes regulating elections are most frequently construed to be directory.   See *Daniel* v. *Simms*, 49 W. Va. 554, 39 S. E. 690, where numerous authorities holding this view are cited.

Were we called upon to construe the election law in a case affecting the right of a voter to cast his vote, or affecting the result of an election because of the mistake or misdeed of a member or members of the electoral board, or other election officer, we would have no difficulty in arriving at the conclusion that the provisions of the law are directory.

Every qualified elector has the right to cast his ballot for the candidate of his choice, untrammeled by the mistakes, misdeeds and irregularities committed by those charged with the preparation of the ballot and the conduct of the election.   Such acts on the part of the officers must not be permitted to disfranchise a voter, or deprive a candidate of a vote for the office to which he aspires.   Otherwise the right of suffrage would be made to depend upon the whim, caprice, bias, prejudice or corruption of those entrusted with the duties relative to elections and primaries.   But when the Commonwealth is seeking to incarcerate in jail one of its citizens for violating one of the provisions of the election law, is the rule of construction the same?   We think not.

The rule that penal laws should be strictly construed is too deeply imbedded in our jurisprudence to require either further discussion or authority to support the proposition. Taking the statute relating to primaries "by its four corners," we are forced to the conclusion that its provisions in regard to the ballot when invoked for the punishment of crime are mandatory.

[11] To hold that the electoral board may delegate its powers in any and all events would be to destroy the legislative intent in regard to the protection of the ballot. Members of the electoral board should be citizens of the highest character, appointed by reason of the confidence reposed in them by the appointing judge of the court. Then to say that they can render nugatory this personal trust in them by delegating it to another, however unworthy he may be, is certainly not our conception of the law.

That the statute itself negatives the idea of a delegated authority to print, count, and seal the ballots, seems clear to us. It says that "said board shall meet as soon as convenient after the printing of the ballots, as provided for in this chapter, of which meeting *the chairman* of the board of supervisors *of the county or the commissioner of accounts* of the corporation or circuit court of the city shall be notified, *and at which there shall* be present the said chairman or commissioner and the members of the said board, *but no other person,* * * *. The ballots shall then be carefully counted by said board and the number thereof entered by the secretary of the board in a book * * * kept for such purpose.

"*The board shall affix* its seal to every ballot * * * and *said chairman or commissioner shall thereupon enter of record upon the* minutes of the electoral board an *affidavit* stating that said ballots were *counted* and *sealed*

*in his presence* in the manner provided by law." (Italics supplied.)

If the legislature intended that the electoral board of Norfolk city could delegate the counting and sealing of the ballots to Farant, Incorporated, then why do the absurd thing of requiring the presence of the commissioner of accounts at the meeting of the board. In this instance, had the commissioner met with the board and made the affidavit required of him, it would have been false.

If the electoral board can delegate its powers to a printer in Norfolk—around whom no legal restraint whatever is thrown—then why could it not delegate the same powers to a printer in San Francisco? There would be no difference in principle it seems. If the secretary of the board, on whom is enjoined eternal vigilance to keep the seal in his sole custody, is to be permitted, without let or hindrance, to turn it over to a public printer, to seal, if so inclined, ballots to be used in an election, or not, as the case may be, then why the waste of printer's ink and paper in providing so minutely how the seal shall be kept inviolate? Then again, if the electoral board can delegate its powers with reference to the ballot, why not also with reference to the appointment of registrars, clerks and judges of elections?

Can it be contended for a moment that a registrar or a judge, appointed by A, who received such power of appointment from the electoral board, would be a legal officer?

The case of *Gleaves* v. *Terry,* 93 Va. 491, 25 S. E. 552, 34 L. R. A. 144, while not meeting the question in this case, is illuminating by reason of the language employed. Judge Cardwell, speaking of the powers and duties of the electoral board, says: "By an act approved March 4, 1896, amendatory of the act of March

6, 1894, entitled 'an act to provide for a method of voting by ballot,' the printing of the ballots, the certification of the same a's the official ballots, and their distribution to the judges of election of the several precincts of their county or city are *delegated* to the electoral board of each county and city."

*In Re Little Beaver T. P. School Directors' Election,* 165 Pa. 237, 30 Atl. 955, 27 L. R. A. 234, the court, in construing whether or not the provisions of a statute are mandatory or directory, said: "The ordinary rule, as has been expressed by recognized authority, is that where power has been given to do a thing in a particular way, then affirmative words, marking out the way, by necessary implication prohibit all other ways."

Under the statute the board is affirmatively directed to count, seal and adopt the ballots in the presence of the commissioner of accounts, who shall certify under affidavit that the same was done accordingly.

While we express no view as to the meaning of the words in section 162, "*and no ballot, save an official ballot specially prepared as provided for in this chapter shall be counted for any person,*" as related to any civil question which may arise, we think the language fortifies our position when construing the criminal provisions of the statute.

In holding that the provisions of the law relating to elections, when applied to crimes, are mandatory, we have reference only to the question involved in the instant case. In our opinion the ballots introduced in evidence were not "official ballots." To constitute a ballot an official ballot—when applied to crimes—it must be one printed under the supervision of a designated member of the electoral board, sealed by the board, "and by resolution declared to be the official ballots for the elections" to be held.

In reaching the foregoing conclusions in this case we are not unmindful of the fact that the evidence points strongly to the moral turpitude of the defendant, and his inclination to become a participant in crime; yet, notwithstanding this situation, it is not meet that we, who sit to judge one after the law, should command that he be condemned contrary to the law!

Having reached the conclusion that the trial court erred in giving the instruction complained of, and in refusing to set aside the verdict of the jury, it is unnecessary to notice the other assignments of error.

Therefore, we are of opinion that the verdict of the jury should be set aside, the case reversed and the same remanded to the trial court to be disposed of according to law.

*Reversed.*

PRENTIS and BURKS, JJ., dissenting:

We cannot agree with the majority that the guilt or innocence of the accused should be made to depend upon the irregularities of the electoral board in preparing the official ballots, or that the same ballots should be construed to be official as to the voters but unofficial as to one charged with an offense against the election laws.